1   **WO**

2

3

4

5

6        **IN THE UNITED STATES DISTRICT COURT**

7          **FOR THE DISTRICT OF ARIZONA**

8

9   Rosendo Mendoza,                  No. CV-15-0351-TUC-BGM

10          Plaintiff,

11                          **ORDER**

12   v.

13   Carolyn W. Colvin,

14   Acting Commissioner of Social Security,

15          Defendant.

16

17        Currently pending before the Court is Plaintiff's Brief for Plaintiff ("Opening

18 Brief") (Doc. 19).  Defendant filed her Corrected Brief ("Response") (Doc. 25-1), and

19 Plaintiff filed his Plaintiff's Reply Brief for Plaintiff ("Reply") (Doc. 26).  The Court also

20 granted Defendant leave to file a Surreply (Doc. 31).  Plaintiff brings this cause of action

21 for review of the final decision of the Commissioner for Social Security pursuant to 42

22 U.S.C. § 405(g).  The United States Magistrate Judge has received the written consent of

23

24 both parties, and presides over this case pursuant to 28 U.S.C. § 636(c) and Rule 73,

25 Federal Rules of Civil Procedure.

26

27   . . .

28   . . .

## I.   BACKGROUND

### A.   *Procedural History*

On January 24, 2012, Plaintiff filed a Title II application for Social Security Disability Insurance Benefits ("DIB") alleging disability as of April 5, 2010 due to a left shoulder due to a work accident and knee pain.[1]  *See* Administrative Record ("AR") at 13, 26, 49, 54–55, 59, 61, 65–66, 78, 82, 142, 172, 211, 228.  Plaintiff's date last insured is September 30, 2014.  *Id.* at 15, 57, 69, 172, 211, 228.  The Social Security Administration ("SSA") denied this application on August 23, 2012.  *Id.* at 13, 54–60, 78–81.  Plaintiff filed a request for reconsideration, and on January 16, 2013, SSA denied Plaintiff's application upon reconsideration.  *Id.* at 13, 65–74, 82–84.  On February 27, 2013, Plaintiff filed his request for hearing.  *Id.* at 13.  On November 18, 2013, a hearing was held before Administrative Law Judge ("ALJ") Lauren R. Mathon.  AR at 13, 24–48.  On January 9, 2014, the ALJ issued an unfavorable decision.  *Id.* at 10–19.  On January 29, 2014, Plaintiff requested review of the ALJ's decision by the Appeals Council, and on June 12, 2015, review was denied.  *Id.* at 1–3, 9.  On August 11, 2015, Plaintiff filed this cause of action.  Compl. (Doc. 1).

### B.   *Factual History*

Plaintiff was sixty-three (63) years old at the time of the administrative hearing and sixty (60) at the time of the alleged onset of his disability.  AR at 29, 49, 54, 61, 65, 144, 172, 211, 228.  Plaintiff has a sixth grade education.  *Id.* at 49, 57, 61, 69, 176.  Prior

---

[1] The January 24, 2012 protective filing date is referenced by the ALJ and other forms; however, there are two instances in Social Security Administration ("SSA") correspondence with Plaintiff that indicate a February 15, 2012 filing date.  AR at 142, 144, 148.

to his alleged disability, Plaintiff worked as a certified welder.  *Id.* at 34, 198–210, 219–28.

### 1. Plaintiff's Testimony

#### a. Administrative Hearing

At the administrative hearing, Plaintiff testified, using an interpreter, that he is married, but lives alone.  AR at 26, 29.  Plaintiff further testified that he does his own laundry, cooking, and food shopping.  *Id.* at 30.  Plaintiff currently supports himself with his Social Security retirement.  *Id.* at 31.  Prior to receiving his retirement, and after the alleged onset of his disability, Plaintiff supported himself through worker's compensation.  *Id.*  Since April 2010, Plaintiff has travelled to California and Mexico either on the bus or in a friend's vehicle.  *Id.* at 32–34.

Plaintiff testified that he worked as a certified welder prior to the alleged onset of his disability, and has not worked since.  AR at 34.  Plaintiff further testified that he has knee and left shoulder pain.  *Id.* at 34–35.  Plaintiff testified that although he is not receiving active treatment for his knee or shoulder, but he is being treated by a pain management doctor.  *Id.* at 35–36.  Plaintiff also testified that he had two prior shoulder surgeries, and his left shoulder still bothers him a lot.  *Id.* at 36.  Plaintiff confirmed that he has difficulty lifting, gripping, and grasping with his left arm.  *Id.* at 36–37.  Plaintiff testified that as a result of these difficulties, he uses his right arm to compensate.  AR at 37.  Plaintiff further testified that his pain was moderately severe on an average day.  *Id.*  Plaintiff stated that his pain increases with increased activity.  *Id.*

Plaintiff testified that because of his knee problems, he has trouble standing for

long periods.  *Id.* at 38.  Plaintiff estimated that he could stand for three (3) hours before needing to sit.  *Id.*  Plaintiff further testified that he stood for six (6) hours, approximately six (6) months prior, while waiting to cross the international border to Mexico.  AR at 38–40.  Plaintiff testified that after approximately three (3) hours standing in line he wanted to sit-down, but it was not possible.  *Id.*  Plaintiff further testified that his knee was very painful after standing for so long, requiring rest and massage.  *Id.* at 40.  Plaintiff testified that his knee hurts to the point of requiring massage and medication every three (3) or four (4) days.  *Id.*

Plaintiff testified that he is able to lift approximately ten (10) pounds from a tabletop without increasing her pain.  *Id.* at 41.  Plaintiff further testified that he takes medication for the pain, including pills and a topical cream.  AR at 41.  Plaintiff also testified that he lays down two (2) or three (3) times per week because of the pain.  *Id.* at 42.  Plaintiff testified that his right shoulder does not cause any problems with reaching or gripping.  *Id.*  Plaintiff testified that the pain in his legs, "a bone that's out on my right shoulder[,]" and the problems with his left shoulder are the primary reasons that he cannot work.  *Id.*

### b. Administrative Forms

Plaintiff completed a Function Report—Adult in this matter.  He indicated that he walks for approximately one (1) hour each day and at noon he is in the house reading or listening to music.  AR at 184.  After supper, Plaintiff stated that he watches television until ten (10) o'clock at night before going to bed.  *Id.*  Plaintiff indicated that he could run and exercise more safely prior to his injuries.  *Id.* at 185.  Plaintiff further indicated

that he cannot sleep much due to his shoulder pain, and he has to take sleeping pills.  *Id.* Plaintiff also testified that he has difficulty changing his clothes and bathing due to leg and shoulder pain.  *Id.*  Plaintiff does not require assistance to care for his personal needs and is able to cook his own meals every day.  AR at 186.  Plaintiff does chores for approximately an hour and a half each day, including laundry and ironing and cleaning the house.  *Id.*  Plaintiff goes out each day and is able to drive and use public transportation.  *Id.* at 187.  Plaintiff grocery shops for approximately an hour and a half each week.  *Id.*  Plaintiff is able to manage his money and pays his own bills.  *Id.* Plaintiff's primary hobbies include watching television, going to baseball games, and reading.  *Id.* at 188.  Plaintiff also attends church each week.  AR at 188.

Plaintiff testified that he feels depressed since the injuries began and his ability to lift, walk, climb stairs, squat and kneel have been affected.  *Id.* at 189.  Additionally, Plaintiff can only lift 25 pounds, has pain in his knees and gets tired after walking.  *Id.* Plaintiff estimated that he needs to rest after approximately one half hour of walking.  *Id.* Plaintiff indicated that he uses a cane for walking.  *Id.* at 190.

Plaintiff also filled out an Exertional Daily Activities Questionnaire.  AR at 192. Plaintiff indicated that he lives in an apartment and described his average day as getting up, making breakfast, and watching television.  *Id.*  Then, at noon he goes out to his patio to sit and listen to the radio.  *Id.*  At night, after dinner, he watches television before bed. *Id.*  Plaintiff described his symptoms as knee pains, a lot of cramps, headaches and exasperation and upset.  *Id.*  Plaintiff indicated that he walks 10–15 minutes to the store. AR at 192.  Plaintiff stated that he can only lift fifteen (15) pounds and goes grocery

- 5 -

shopping every fifteen (15) days.  *Id.* at 193.  Plaintiff indicated that he does household chores weekly, and goes to the park to see baseball or soccer games every week or every other week.  *Id.*  Plaintiff states that he cannot stay as long at the park, because he gets tired.  *Id.*  Plaintiff also needs a nap during the day.  *Id.*  Plaintiff indicated that he uses the cane.  AR at 194.  Plaintiff's medications include Meloxicam, Tizanidine HCL, and Medrox.  *Id.*

## 2.  Vocational Expert Valerie Williams's Testimony

Ms. Valerie Williams testified as a vocational expert at the administrative hearing.  AR at 28, 43.  Ms. Williams described Plaintiff's past work as a welder, combination, Dictionary of Occupational Titles ("DOT") code 819.384-010 as medium exertion, and a Specific Vocational Preparation ("SVP") of 6.  *Id.* at 43.  Ms. Williams further testified that there were no transferrable skills from welder to any other medium or light occupations.  *Id.*

The ALJ asked Ms. Williams about a hypothetical individual with the same age, education, and vocational background as Plaintiff.  *Id.*  The ALJ asked Ms. Williams whether, assuming that such a person could "do medium level exertional work with the following additional limitations[:] postural limitations [of] . . . occasionally climb[ing] ladders; ropes; and scaffolds; . . . frequently climb[ing] ramps; stairs; balance; stoop; knell; crouch; . . . occasionally crawl; [and] reaching over head with the left arm is limited to occasional[,]" such a person could do the job of welder.  *Id.* at 43–44.  Ms. Williams testified that such an individual would be able to do the job of welder.  AR at 44.  Ms. Williams further testified that there are 304,500 welder jobs available in the

national economy, and 2,978 such jobs in Arizona.  *Id.*  The ALJ added a further restriction of being able to stand or walk two (2) hours in an eight (8) hour day to the hypothetical.  *Id.* at 45.  Ms. Williams confirmed that such a person would be restricted to sedentary work.  *Id.*

Plaintiff's counsel asked Ms. Williams about the ALJ's hypothetical person number one, adding a restriction to the left upper extremity of "occasional reaching; gripping; and grasping; and handling; and feeling" due to multiple surgical procedures. *Id.* at 45–46.  Ms. Williams testified that a person with those additional restrictions would not be able to perform the job of a welder.  AR at 46.  Plaintiff's counsel posed a question regarding second hypothetical individual "who can lift and carry with right arm only; standing up to three-hours in a work day; never crawl; climb; push; pull; gross flame — and fine manipulations are limited to occasional with the left" and whether or not such an individual would be able to do any past work.  *Id.*  Ms. Williams testified that such an individual could not do the past relevant work of welder, and that such an individual would be relegated to light work.  *Id.* at 47.

Ms. Williams further testified that her testimony was consistent with her interpretation of the DOT.  *Id.* at 47.

### 3. Plaintiff's Medical Records

On March 17, 2009, Plaintiff saw Joseph Lee, M.D. at Mariposa Community Health Center for a follow-up regarding his "right knee pain."  AR at 262–63.  Plaintiff's "pain has been getting worse[,] [it] hurts to stand, walk, and sleep[,] [and Plaintiff] has not been able to work for past three months."  *Id.* at 262.  Plaintiff was using a cane, and

Dr. Lee noted that his knee also "swells and locks and gives out." *Id.* Plaintiff was only taking Tylenol for pain. *Id.* Dr. Lee's assessment of Plaintiff's right knee showed "no deformity or redness or bruising." *Id.* at 263. Dr. Lee further noted "diffuse warmth[,] positive bilateral joint line tenderness[,] good [range of motion,] neg[ative] drawers[,] collaterals good[,] neg[ative] mcmurray[,] positive shrugg[,] slight effusion[,] [and] coarse crepitus." AR at 263. Dr. Lee "suspect[ed] inflammatory arthritis, osteoarthritis, patellofemoral and degenerative meniscual disease[.]" *Id.* Radiographs taken the same date indicated "very severe osteoarthritis." *Id.* at 267, 295. Fred Brickman, M.D. noted "[r]etropatellar cupping and spurring[,] [r]etropatellar spurs are very large, as is the opposing anterior femoral epicondylar spur[;] [v]ery large posterior epicondylar spurs[;] large anterior tibial plateau spurs[;] [m]arked narrowing, cartilage loss, of the medial joint compartment with marked irregularity of medial femur and tibia[;] [degenerative joint disease] at tibiofibular joint[;] [and] [i]rregularity and spurring of both medial and lateral tibial plateaus and condyles, worse medially than laterally." *Id.* at 267, 295.

On April 2, 2009, Plaintiff was seen for an initial evaluation in physical therapy at Arizona Physical Therapy & Sports Rehabilitation, P.C. regarding his right knee. AR at 358. Plaintiff was discharged from physical therapy on April 8, 2009, because "the patient expressed that he was now able to walk at least 30 minutes." *Id.* at 357.

On August 7, 2009, Plaintiff was seen by Dr. Lee for neck pain. AR at 255–56, 329–30. Plaintiff indicated that it hurt on the right side and had been ongoing for about two (2) to three (3) years. *Id.* at 255, 329. Dr. Lee assessed "neck pain mechanical from the neck[,] suspect spondylosis" and advised "avoid[ing] extreme and forceful neck

motions." *Id.* at 256, 330.  Radiographs taken the same date showed "[e]xtensive cervical osteoarthritis."  *Id.* at 266, 294.  Dr. Brickman assessed "[c]ervical osteoarthritis is present[;] . . . [with] narrowing of the C3-4, C5-6-7 discs[;] [t]here is 5 mm of anterior subluxation of C4 and 2 mm of anterior subluxation of C6[;] [a]nterior spurs are present at C3 through C7[;] [and] [t]here are lateral articular pillar irregularities and sclerosis at C3 through C7."  *Id.*  On August 25, 2009, Plaintiff saw Dr. Lee regarding left leg pain.  AR at 324–25.  Dr. Lee noted no redness or bruising on the left knee, but some fluid, and a reduced range of motion.  *Id.* at 325.  Dr. Lee also noted that Plaintiff walked with a limp, and the mobility of his knee cap was reduced.  *Id.*  Dr. Lee prescribed Percocet and rest, with a referral to orthopedics.  *Id.*  That same date, radiographs of Plaintiff's left knee were taken.  AR at 293.  Dr. Brickman noted left knee osteoarthritis with "a large posterior superior patellar spur, loss of retropatellar space, and posterior epicondylar spurring."  *Id.*  Dr. Brickman further noted "[a] tiny suprapatellar bursa effusion is suggested on one view[,] [and] [f]ractures are absent."  *Id.*

On September 2, 2009, Plaintiff was seen by John R. Klein, M.D. regarding his knee pain.  AR at 353–56.  Dr. Klein's examination of his left knee "reveal[ed] good [range of motion;] . . . [a] mild medial and lateral joint line tenderness . . . [m]otor strength is intact . . . [and] [n]o numbness or tingling in either lower extremity."  *Id.* at 354, 356.  Dr. Klein indicated that "[x]-rays of the left knee reveal degenerative arthritis."  *Id.* at 354, 356.  Dr. Klein assessed degenerative joint disease of Plaintiff's left knee, and gave a cortisone shot.  *Id.* at 353–56.

On October 21, 2009, Plaintiff was seen by Enrique Suarez, M.D. for a consultive

examination.  Dr. Suarez notes that Plaintiff had some problems with his right meniscus, but "underwent arthroscopic surgery, with an apparent good result."  AR at 280.  Dr. Suarez further notes that the left knee is to be evaluated further by Dr. Klein after an initial diagnosis of arthritis.  *Id.*  Dr. Suarez also notes that Plaintiff was taking ibuprofen and Flexeril, but obtaining only minor relief.  *Id.*  Dr. Suarez's physical examination indicated that Plaintiff "was able to squat with some minimal pain . . . 90 percent normal[,] [and] [t]he right knee showed 1+ crepitus[,] [t]he left knee showed normal range of motion, with minimal pain at the end of the test."  *Id.* at 281.  Dr. Suarez's impression, however, stated that "[t]he right knee appeared to be normal after the arthroscopic surgery years ago[,] [t]he left knee showed 1+ crepitus, and [Plaintiff] is using a cane for assistance."  *Id.*  Dr. Suarez indicated that Plaintiff could stand 6–8 hours in an 8 hour day, uses an assistive device, and could occasionally climb ramps, stairs, ladders, ropes, and scaffolds; occasionally stoop, kneel; and is unlimited in his ability to crouch, crawl, reach, handle, finger, and feel.  AR at 283–84.  On October 13, 2009, additional radiographs of Plaintiff's cervical spine were taken and compared with the August 7, 2009 films.  *Id.* at 292.  Robert L. Reese, M.D. noted "[n]o significant interval change since the pervious study other than that the head was tilted slightly to the left on the current study."  *Id.*  Dr. Lee's assessment on the same date indicated cervical spine weakness and mild pain with motion.  *Id.* at 317.  On October 26, 2009, Plaintiff saw Dr. Lee for right neck pain.  *Id.* at 313–14.  Dr. Lee assessed possible bursitis tendonitis or inflammatory arthritis and brachial neuritis or radiculitis not otherwise specified.  AR at 314.  On October 28, 2009, Plaintiff had additional radiographs of his right shoulder.  *Id.*

at 291.  Dr. Brickman noted an "[a]bnormal rotator cuff" with a "loss of shoulder rotator cuff space suggesting a torn rotator cuff[;] [t]he AC joint shows slight cystic change of the acromion opposite the clavicle[;] [f]ractures are absent."  *Id.*  On the same date, Plaintiff saw Dr. Klein regarding his right shoulder pain.  *Id.* at 352.  Dr. Klein's examination "reveal[ed] almost complete [range of motion] of the shoulder[;] [n]o evidence of instability[;] [and] [s]trength is intact."  *Id.*  Dr. Klein assessed right shoulder degenerative joint disease and administered a cortisone shot.  AR at 352.

On April 7, 2010, Plaintiff had radiographs of both his right and left shoulders and acromioclavicular joints.  AR at 290.  Regarding Plaintiff's left shoulder, Dr. Brickman noted a "narrowing of the left AC joint[;] . . . slight cystic change in the distal clavicle[;] [f]ractures are absent[;] [and] [g]rossly, the glenohumeral joint is normal.  *Id.*  Dr. Brickman found this to indicate distal clavicular osteoarthritis.  *Id.*  Examination of Plaintiff's left AC joint "show[ed] the same irregularity of the distal clavical[;] [and] [f]ractures are absent."  *Id.*  Dr. Brickman again indicated osteoarthritis of the distal clavicle.  *Id.*  Review of Plaintiff's right should showed "severe osteoarthritis of the right humeral head similar to 10/26/2009[;] . . . a large inferomedial humeral head spur[;] . . . marked loss of glenohumeral joint space[;] [and] [t]he left AC joint is narrowed."  AR at 290.  Dr. Brickman noted chronic severe arthritis.  *Id.*  Review of Plaintiff's right AC joint indicated that it "remains narrowed, nearly absent[;] [with] [s]evere left [sic] should osteoarthritis is present[;] [and] [f]ractures are absent."  *Id.*  Dr. Brickman noted "[s]evere shoulder, humeral head, and AC joint osteoarthritis.  *Id.*  Dr. Brickman further noted that "there is loss of space between humeral head and acromion process consistent with an

- 11 -

abnormal rotator cuff similar to before." *Id.* John Knoblock, FNP examined Plaintiff on the same date, and assessed left shoulder asymmetry of clavicles with moderate pain with motion and right shoulder tenderness and moderate pain with motions. AR at 307. Nurse Practitioner Knoblock prescribed Loratadine, Diphenhydramine HCl, and Ibuprofen. *Id.* On April 14, 2010, Plaintiff saw Dr. Klein for bilateral shoulder pain. *Id.* at 350–51. Dr. Klein noted full range of motion, but lacking "a few degrees of full internal rotation of the right shoulder." *Id.* at 350. Plaintiff demonstrated "[n]o weakness with resisted external rotation of the right shoulder but positive weakness with resisted external rotation of the left shoulder." *Id.* Plaintiff had a "[f]ull range of motion of both elbows and wrists." AR at 350. Further, "[m]otor strength [was] intact in both upper extremities . . . [and] [n]o numbness or tingling in either upper extremity" was documented. *Id.* Reflexes were intact and good range of motion of the cervical spine without pain was assessed. *Id.* Dr. Klein assessed a possible rotator cuff tear in Plaintiff's left shoulder and osteoarthritis in his right shoulder. *Id.* at 351. Dr. Klein also wrote a note to keep Plaintiff "off work until further notice." *Id.* at 404. On April 28, 2010, Plaintiff followed-up with Dr. Klein, and an MRI was ordered. *Id.* at 349.

On June 23, 2010, Dr. Klein wrote a note placing Plaintiff "off work until further notice." *Id.* at 406. On July 15, 2010, Plaintiff saw Jennifer Swiney, M.D. "for a pre-operative clearance for shoulder surgery." AR at 304. Dr. Swiney also noted that Plaintiff "walks 2 miles a day in about 45 minutes[.]" *Id.* Plaintiff had an abnormal EKG, and as such was referred to cardiology for pre-op clearance. *Id.* at 305. On July 16, 2010, Plaintiff saw Dr. Klein regarding his left shoulder pain. *Id.* at 369.

Examination "reveal[ed] full range of motion, slight weakness with resisted external rotation, positive impingement sign." *Id.* at 369.   Dr. Klein assessed a left shoulder rotator cuff tear. *Id.* at 370.   On July 21, 2010, Plaintiff was again seen by Dr. Swiney to review laboratory results. *Id.* at 302–03.   Dr. Swiney noted that Plaintiff had been to cardiology, but Plaintiff did not yet know the results. *Id.* at 302.   On July 29, 2010, Plaintiff saw Dr. Klein who noted that Plaintiff's "left shoulder reveal[ed] full range of motion, positive weakness with resisted external rotation, positive impingement[,] [and an] MRI . . . confirm[ed] a full-thickness rotator cuff tear." *Id.* at 368.

On August 16, 2010, Dr. Klein performed a "[l]eft shoulder arthroscopy, arthroscopic rotator cuff repair, and acromioplasty" on Plaintiff without complications. AR at 371–72.   On August 17, 2010, Plaintiff saw Dr. Klein after a surgical repair of his left rotator cuff.   AR at 348.   Dr. Klein showed Plaintiff "how to do passive outward rotation exercises." *Id.*   On August 25, 2010, Plaintiff again saw Dr. Klein, and examination "reveal[ed] good passive outward rotation." *Id.*

On September 8, 2010, Plaintiff saw Dr. Klein, who showed him "how to do passive forward flexion and internal rotation exercises." *Id.*   Dr. Klein noted that he "emphasized to him that no active range of motion is allowed." *Id.*   On September 15, 2010, Dr. Klein examined Plaintiff indicating a "full [range of motion] of the shoulder, [and] no pain."   AR at 345.   On October 6, 2010, Plaintiff saw Dr. Klein, whose examination "reveal[ed] full passive [range of motion], [and] no pain." *Id.* at 344.   On November 17, 2010, Dr. Klein examined Plaintiff and noted a full range of motion of the left shoulder, and no significant pain. *Id.* at 343.   Plaintiff expressed that he did not want

to go to physical therapy, so Dr. Klein instructed him to return to be shown exercises.  *Id.*
On November 30, 2010, Plaintiff saw Dr. Klein who noted good range of motion of the
shoulder and no significant weakness.  *Id.* at 342.   Dr. Klein showed Plaintiff the
exercises that he is to do.  *Id.*

On April 22, 2011, Plaintiff saw Dr. Klein after having begun to develop recurrent
pain.  AR at 364.  Upon examination, Dr. Klein noted that "the left shoulder reveals full
range of motion, positive weakness with resisted internal rotation, positive
impingement."  *Id.*  "His MRI of the left shoulder reveals a recurrent rotator cuff tear of
the left shoulder."  *Id.*  On April 25, 2011, Plaintiff underwent a "[l]eft shoulder
arthroscopy, arthroscopic rotator cuff repair revision, acromioplasty and biceps
tenotomy."  *Id.* at 365–367.

On December 21, 2011, Plaintiff was seen by Sanjay R. Patel, M.D. "for
evaluation of injury to primarily his left shoulder."  AR at 379–82.  Plaintiff indicated
that "his pain level varies from a 4 out of 10 to an 8 out of 10" and "is located in the
anterior shoulder."  *Id*. at 379.  Plaintiff stated that "anything that he lefts with his left
arm he feels a pins and needles sensation in the anterior shoulder plus weakness."  *Id.* at
380.  Plaintiff stated that he was taking Tylenol.  *Id.*  Plaintiff further indicated that he is
able to lift a gallon of milk and approximately thirty (30) pounds with his left arm.  *Id.*
Dr. Patel indicated that Plaintiff has unrestricted sitting, standing and walking."  AR at
380.  Dr. Patel noted a slight shoulder height discrepancy and "[r]ange of motion of the
left shoulder in abduction is to 160 degrees[,] [f]orward flexion is to 160 degrees,
external rotation is to 5 degrees and internal rotation is normal."  *Id.*  Additionally,

"[c]ervical range of motion is full." *Id.*  Dr. Patel further noted that "[p]alpation of the anterior shoulder produces significant pain that reproduces his current symptoms . . . [and] some diffuse tenderness in the left cervical trapezius." *Id.* at 381.  Dr. Patel suggested "an anti-inflammatory, a non-narcotic topical analgesic balm and a muscle relaxant as [Plaintiff] continues to have some tightness around the shoulder girdle." *Id.* Dr. Patel further opined that Plaintiff would benefit from two or three joint injections per year. *Id.*  Dr. Patel indicated that there were no restrictions on use for Plaintiff's right upper extremity.  AR at 381.

On August 15, 2012, Plaintiff saw Shantanu K. Thakur, M.D. for a "follow up for left shoulder pain, radiating to the upper anterior chest." *Id.* at 384.  Dr. Thakur notes Plaintiff's pain as unchanged from the last visit, and 5/10 currently and 9/10 at its worst. *Id.*  Dr. Thakur injected Plaintiff's shoulder with Marcaine and Dexamethasone without complication. *Id.* at 385.

On November 19, 2012, Plaintiff again saw Dr. Thakur regarding his left shoulder. Plaintiff reported moderate pain relief after the August 2012 shoulder injection, but continued to have chronic pain and weakness at the left shoulder. *Id.* at 386.  Plaintiff reported that medications are helping including, Medrox, Meloxicam, and Tizanidine HCl.  AR at 386.  Dr. Thakur reported tenderness and some painful limitation of range of motion. *Id.* at 387.  Dr. Thakur did not inject Plaintiff's left shoulder as "symptoms [were] under reasonable control." *Id.*  Dr. Thakur assessed Plaintiff's ability to do work related activities on that same date.  Dr. Thakur indicated that Plaintiff could sit continuously for 1–2 hours at a time, for a total of eight (8) hours per day. *Id.* at 389.  Dr.

Patel further opined that Plaintiff could stand or walk for one (1) hour per day or a total of three (3) hours per day.  *Id.*  Dr. Thakur stated that Plaintiff could continuously lift up to ten (10) pounds, frequently lift 11–20 pounds, occasionally lift 21–25 pounds and never lift more than 26 pounds.  AR at 389.  Dr. Thakur also stated that plaintiff could continuously lift up to ten (10) pounds, frequently lift 11–20 pounds and never lift more than 21 pounds.  *Id.*  Additionally, Dr. Thakur noted "lift/carry w/ right side only[.]"  *Id.*  Dr. Thakur indicated that Plaintiff could frequently stoop and squat, never craw or climb, and frequently reach with his right shoulder.  *Id.* at 390.  Regarding Plaintiff's right hand, Dr. Thakur opined that Plaintiff could continuously perform simple grasping, pushing/pulling of controls, and fine manipulation.  *Id.*  Regarding Plaintiff's left hand, Dr. Thakur opined that Plaintiff could occasionally perform simple grasping, pushing/pulling of controls, and fine manipulation.  AR at 390.  Dr. Thakur indicated that Plaintiff could use both his right and left foot to push leg controls, as well as using both feet together.  *Id.*  Dr. Thakur noted that Plaintiff had mild restriction in activities involving unprotected heights and driving automobile equipment, but was unrestricted being around moving machinery, exposure to dust, fumes, and gasses, or exposure to marked changes in temperature or humidity.  *Id.*  Finally, Dr. Thakur indicated that Plaintiff activities were moderately limited by pain.  *Id.* at 391.

On April 11, 2013, Plaintiff saw Dr. Patel for a follow-up visit.  AR at 397–99. Dr. Patel noted that Plaintiff's prior shoulder injection helped, but "wore off after about 1-1/2 months to 2 months."  *Id.* at 397.  Dr. Patel again injected Plaintiff's left shoulder with Dexamethasone sodium phosphate, Marcaine, and sodium bicarbonate.  *Id.*  Dr.

Patel noted Plaintiff's "[r]ange of motion of the left shoulder in abduction is to 160 degrees[;] [f]orward flexion is to 160 degrees[;] external rotation is to 5 degrees and internal rotation is normal[;] [and] [c]ervical range of motion is full." *Id.* at 398.  Dr. Patel indicated that Plaintiff was to discontinue Meloxicam and begin Relafen, continue on the topical analgesic balm, and tizanidine. *Id.* at 399.

On July 23, 2013, Plaintiff followed up with Laavanya C. Raju, M.D., reporting continuing to have "waxing and waning shoulder pain." *Id.* at 394.  Dr. Raju noted that a medication from Naprosyn to Relafen "appears to have helped." *Id.*  Dr. Raju further noted Plaintiff's left shoulder range of motion "in abduction is to 160 degrees[;] [f]orward flexion is to 160 degrees[;] external rotation is to 5 degrees and internal rotation is normal."  AR at 395.  Dr. Raju also noted that "[c]ervical range of motion is full." *Id.*  Dr. Raju indicated that "[p]alpation of the anterior shoulder produces significant pain that reproduces [Plaintiff's] current symptoms." *Id.*  Dr. Raju further indicated that Plaintiff would "be managed with medications." *Id.*  Additionally, Plaintiff "has had the addition of orphenadrine citrate twice during the day and tizanidine 4mg one to two at night, all to be used as needed[;] [a] topical cream will also be used three to four times daily." *Id.*

On November 14, 2013, Dr. Patel also assessed Plaintiff's ability to do work related activities.  AR at 400–02.  Dr. Patel reported that Plaintiff could sit continuously for an hour at the time, but had no restriction on the number of hours he could sit during an 8 hour work day. *Id.* at 400.  Dr. Patel further reported that Plaintiff could stand or walk for a total of two (2) hours in an eight (8) hour work day. *Id.*  Regarding Plaintiff's

left upper extremity, Dr. Patel indicated that Plaintiff could continuously lift up to five (5) pounds; frequently lift up to ten (10) pounds; occasionally lift up to twenty (20) pounds; and never lift twenty-one (21) pounds or more.  *Id.*  Also regarding Plaintiff's left upper extremity, Dr. Patel opined that Plaintiff could carry up to five (5) pounds continuously; frequently carry up to ten (10) pounds; occasionally carry up to twenty (20) pounds; and never lift twenty-one (21) pounds or more.  *Id.*  Dr. Patel further opined that Plaintiff could continuously stoop or squat, occasionally climb, and never crawl or reach.  AR at 401.  Additionally, Dr. Patel indicated "LUE" (left upper extremity) in this section.  *Id.*  Dr. Patel noted that Plaintiff could perform simple grasping, pushing/pulling of controls, and fine manipulation continuously with his right arm, and occasionally perform simple grasping and pushing/pulling of controls with his left arm and frequently perform fine manipulation with his left arm.  *Id.*  Dr. Patel indicated that Plaintiff could use either his left or right foot, as well as both feet, for repetitive movements.  *Id.*  Dr. Patel opined that Plaintiff is unrestricted in his exposure to dust, fumes, and gases, and to marked changes in temperature or humidity.  *Id.*  Dr. Patel further opined that Plaintiff had mild restriction being around moving machinery and occupational driving, and moderate restriction in unprotected heights.  *Id.*  Finally, Dr. Patel opined that Plaintiff's limitation on activities was moderately severe, but did not indicate whether the limitation was caused by pain or fatigue.  AR at 402.

## II.     STANDARD OF REVIEW

The factual findings of the Commissioner shall be conclusive so long as they are

based upon substantial evidence and there is no legal error.   42 U.S.C. §§ 405(g), 1383(c)(3); *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008).  This Court may "set aside the Commissioner's denial of disability insurance benefits when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole."  *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999) (citations omitted); *see also Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1098 (9th Cir. 2014).

Substantial evidence is "'more than a mere scintilla[,] but not necessarily a preponderance.'"  *Tommasetti*, 533 F.3d at 1038 (quoting *Connett v. Barnhart*, 340 F.3d 871, 873 (9th Cir. 2003)); *see also Garrison v. Colvin*, 759 F.3d 995, 1009 (9th Cir. 2014).  Further, substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007).  Where "the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ."  *Tackett*, 180 F.3d at 1098 (citing *Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992)); *see also Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007).  Moreover, the court may not focus on an isolated piece of supporting evidence, rather it must consider the entirety of the record weighing both evidence that supports as well as that which detracts from the Secretary's conclusion. *Tackett*, 180 F.3d at 1098 (citations omitted).

. . .

. . .

. . .

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## III.   ANALYSIS

### A.   The Five-Step Evaluation

The Commissioner follows a five-step sequential evaluation process to assess whether a claimant is disabled.  20 C.F.R. § 404.1520(a)(4).  This process is defined as follows:  Step one asks is the claimant "doing substantial gainful activity[?]"  If yes, the claimant is not disabled; step two considers if the claimant has a "severe medically determinable physical or mental impairment[.]"  If not, the claimant is not disabled; step three determines whether the claimant's impairments or combination thereof meet or equal an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App.1.  If not, the claimant is not disabled; step four considers the claimant's residual functional capacity and past relevant work.  If claimant can still do past relevant work, then he or she is not disabled; step five assesses the claimant's residual functional capacity, age, education, and work experience.  If it is determined that the claimant can make an adjustment to other work, then he or she is not disabled.  20 C.F.R. § 404.1520(a)(4)(i)-(v).

In the instant case, the ALJ found that Plaintiff met the insured status requirements of the Social Security Act through September 30, 2014, and was not engaged in substantial gainful activity since his alleged onset date of April 5, 2010.  AR at 15.  At step two of the sequential evaluation, the ALJ found that "the claimant has the following severe impairments: two surgical interventions on the left shoulder and degenerative joint disease in left knee (20 CFR 404.1520(c))."  *Id.*  At step three, the ALJ found that "[t]he claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404,

Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526)." *Id.* Prior to step four and "[a]fter careful consideration of the entire record," the ALJ determined that "the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) except as follows: can occasionally climb ladders, ropes and scaffolds; can frequently climb ramps and stairs, balance, stoop, kneel, crouch and occasionally crawl; and can occasionally reach overhead with the left arm." AR at 16. At step four, the ALJ found that "[t]he claimant is capable of performing past relevant work as a certified welder[,] [t]his work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565)." *Id.* at 18. Accordingly, the ALJ determined that Plaintiff was not disabled. *Id.* at 19.

Plaintiff asserts that the ALJ erred in failing to accord sufficient deference to Plaintiff's treating physicians, Drs. Thakur and Patel, as well as rejecting Plaintiff's own symptom testimony. Pl.'s Opening Br. (Doc. 19) at 16–28.

### B.    *Plaintiff's Symptoms*

"To determine whether a claimant's testimony regarding subjective pain or symptoms is credible, an ALJ must engage in a two-step analysis." *Lingenfelter v. Astrue*, 204 F.3d 1028, 1035–36 (9th Cir. 2007). First, "a claimant who alleges disability based on subjective symptoms 'must produce objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged[.]'" *Smolen v. Chater*, 80 F.3d 1273, 1281–82 (9th Cir. 1996) (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991) (*en banc*) (internal quotations omitted)); *see also Ghanim v. Colvin*, 763 F.3d 1154, 1163 (9th Cir. 2014).

Further, "the claimant need not show that her impairment could reasonably be expected to cause the severity of the symptom she has alleged; she need only show that it could reasonably have caused some degree of the symptom."  *Smolen*, 80 F.3d at 1282 (citations omitted).  "Nor must a claimant produce 'objective medical evidence of the pain or fatigue itself, or the severity thereof.'"  *Garrison v. Colvin*, 759 F.3d 995, 1014 (9th Cir. 2014) (quoting *Smolen*, 80 F.3d at 1282).  "[I]f the claimant meets this first test, and there is no evidence of malingering, 'the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so.'"  *Lingenfelter*, 504 F.3d at 1036 (quoting *Smolen*, 80 F.3d at 1281); *see also Burrell v. Colvin*, 775 F.3d 1133, 1137 (9th Cir. 2014) (rejecting the contention that the "clear and convincing" requirement had been excised by prior Ninth Circuit case law).  "This is not an easy requirement to meet: 'The clear and convincing standard is the most demanding required in Social Security cases.'"  *Garrison*, 759 F.3d at 1015 (quoting *Moore v. Comm'r of Soc. Sec. Admin.*, 278 F.3d 920, 924 (9th Cir. 2002)).

"Factors that an ALJ may consider in weighing a claimant's credibility include reputation for truthfulness, inconsistencies in testimony or between testimony and conduct, daily activities, and 'unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment.'"  *Orn v. Astrue*, 495 F.3d 625, 636 (9th Cir. 2007) (quoting *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989)); *see also Ghanim*, 763 F.3d at 1163.  The Ninth Circuit Court of Appeals has "repeatedly warned[, however,] that ALJs must be especially cautious in concluding that daily activities are inconsistent with testimony about pain, because impairments that would unquestionably

preclude work and all the pressures of a workplace environment will often be consistent with doing more than merely resting in bed all day."  *Garrison*, 759 F.3d at 1016 (citations omitted).   Furthermore, "[t]he Social Security Act does not require that claimants be utterly incapacitated to be eligible for benefits, and many home activities may not be easily transferable to a work environment where it might be impossible to rest periodically or take medication."  *Smolen*, 80 F.3d at 1287 n. 7 (citations omitted).  The Ninth Circuit Court of Appeals recently noted:

> The critical differences between activities of daily living and activities in a full-time job are that a person has more flexibility in scheduling the former than the latter, can get help from other persons . . . , and is not held to a minimum standard of performance, as she would be by an employer.  The failure to recognize these differences is a recurrent, and deplorable, feature of opinions by administrative law judges in social security disability cases.

*Garrison*, 759 F.3d at 1016 (quoting *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012)) (alterations in original).  "While ALJs obviously must rely on examples to show why they do not believe that a claimant is credible, the data points they choose must *in fact* constitute examples of a broader development to satisfy the applicable 'clear and convincing' standard."  *Id.* at 1018 (emphasis in original) (discussing mental health records specifically).  "Inconsistencies between a claimant's testimony and the claimant's reported activities provide a valid reason for an adverse credibility determination.  *Burrell*, 775 F.3d at 1137 (citing *Light v. Soc. Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997)).

Here, the ALJ properly delineated the two-step process for assessing Plaintiff's pain testimony.  AR at 16.  Plaintiff asserts that after stating the appropriate test, "the

ALJ launched upon an extensive summary of the medical evidence in this record, but at no point did the ALJ connect anything in those findings to a conclusion that Mendoza was untruthful in reporting symptoms related to his orthostatic hypotension."   Pl.'s Opening Br. (Doc. 19) at 27.   The Court notes that Plaintiff does not allege suffering from orthostatic hypotension, but Plaintiff's brief is unclear whether his disagreement with the ALJ's assessment lies in her treatment of his knee pain or left shoulder pain or both.

Additionally, Plaintiff provides a cursory reference to a recent Social Security Ruling regarding the evaluation of symptoms in disability claims.  Pl.'s Reply (Doc. 26) at 7; SSR 16-3P, 2016 WL 1119029.  SSR 16-3p went into effect on March 16, 2016, after the ALJ's assessment in this case.  SSR 16-3p supersedes SSR 96-7p, the previous policy governing the evaluation of symptoms.  SSR 16-3p, 2016 WL 1119029, *1.  The ruling indicates that "we are eliminating the use of the term 'credibility' from our sub-regulatory policy, as our regulations do not use this term."  *Id.*  Moreover, "[i]n doing so, we clarify that subjective symptom evaluation is not an examination of an individual's character[;] [i]nstead, we will more closely follow our regulatory language regarding symptom evaluation."  *Id.*  This ruling is consistent with the previous policy, and clarifies rather than changes existing law.  *Compare* SSR 16-3p with SSR 96-7p (both rely on two step process followed by an evaluation of claimant's testimony and contain the same factors for consideration).

The ALJ correctly observed that Plaintiff "alleges knee pain, but there are no treatment records for his knee condition."  AR at 16, 18.  The ALJ went on to note that

"the claimant stated there are times when he is unable to stand because of knee pain, but as recently as six months ago he stood for six hours in line waiting to cross the international border." *Id.* at 16.  The ALJ further noted that Plaintiff "is capable of domestic and international travel, having visited family and friends in southern California and in Mexico." *Id.*   Additionally, the ALJ observed that "[a]s recently as July 23, 2013, there was no mention of knee pain in Dr. Patel's treatment notes, only left shoulder pain." *Id.* at 16–17, 18.  Further, the ALJ stated that "Dr. Patel noted the claimant takes over-the-counter medication to manage his pain." *Id.* at 17, 18.   The ALJ also highlighted claimant's statement during an evaluation "that he walks two miles a day in about 45 minutes." *Id.* at 17 (citations omitted).   Finally, the ALJ noted that on November 14, 2011, Dr. Klein cleared Plaintiff for return to work.  AR at 18.

The Court finds that the ALJ provided specific reasons for discounting Plaintiff's testimony which are supported by substantial evidence in the record.  *See Tommasetti v. Astrue*, 533 F.3d 1035, 1040 (9th Cir. 2008).   "If the ALJ's credibility finding is supported by substantial evidence in the record, we may not engage in second-guessing." *Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002) (citations omitted).

### C. Treating Physician Opinions

Plaintiff asserts that the ALJ rejected the Assessments of Drs. Thakur and Patel without sufficient rationale for doing so.  Pl.'s Opening Br. (Doc. 19) 19–24.  Conversely, the Commissioner argues that the ALJ's reasoning was sufficient.  Def.'s Response (Doc. 25-1) at 6–10.

"As a general rule, more weight should be given to the opinion of a treating source

than to the opinion of doctors who do not treat the claimant." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1996) (citing *Winans v. Bowen*, 853 F.2d 643, 647 (9th Cir. 1987)); *see also Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014). "The opinion of a treating physician is given deference because 'he is employed to cure and has a greater opportunity to know and observe the patient as an individual.'" *Morgan v. Comm'r of the SSA*, 169 F.3d 595, 600 (9th Cir. 1999) (quoting *Sprague v. Bowen*, 812 F.2d 1226, 1230 (9th Cir. 1987) (citations omitted)). "The ALJ may not reject the opinion of a treating physician, even if it is contradicted by the opinions of other doctors, without providing 'specific and legitimate reasons' supported by substantial evidence in the record." *Rollins v. Massanari*, 261 F.3d 853, 856 (9th Cir. 2001) (citing *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998)); *see also Orn v. Astrue*, 495 F.3d 625, 632 (9th Cir. 2007); *Embrey v. Bowen*, 849 F.2d 418, 421 (9th Cir. 1988). "The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Embrey*, 849 F.2d at 421 (quoting *Cotton v. Bowen*, 799 F.2d 1403, 1408 (9th Cir. 1986)). Moreover, "[e]ven if a treating physician's opinion is controverted, the ALJ must provide specific, legitimate reasons for rejecting it." *Id.* (citing *Cotton*, 799 F.2d at 1408). Additionally, "[a] physician's opinion of disability 'premised to a large extent upon the claimant's own account of his symptoms and limitations' may be disregarded where those complaints have been 'properly discounted.'" *Morgan*, 169 F.3d at 602 (quoting *Fair v. Bowen*, 885 F.2d 597, 605 (9th Cir. 1989) (citations omitted)). "Similarly, an ALJ may not simply reject a treating physician's opinions on the ultimate issue of disability." *Ghanim v.*

- 26 -

*Colvin*, 763 F.3d 1154, 1161 (9th Cir. 2014).  "[T]he more consistent an opinion is with the record as a whole, the more weight we will give to that opinion."   20 C.F.R. § 404.1527(c)(4).

The ALJ provided a detailed and thorough summary of the medical evidence, then concluded "[t]he undersigned assigns little evidentiary weight to the medical source statements of Dr. Thekur [sic] and Dr. Patel as they are overly restrictive based on the overall record and the objective evidence therein."   AR at 18 (citations omitted).   "The ALJ must do more than state conclusions. [She] must set forth [her] own interpretations and explain why they, rather than the doctor's are correct."  *Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014) (citations omitted).   Furthermore, "[t]he ALJ is required to consider the factors set out in 20 CFR § 404.1527(c)(2)-(6) in determining how much weight to afford the treating physician's medical opinion."  *Ghanin*, 763 F.3d at 1161; *Garrison*, 759 F.3d at 1012 n. 5.  The ALJ did not do so here, and as such, failed to set forth "specific and legitimate" reasons supported by "substantial evidence in the record" for her dismissal of Drs. Thakur and Patel's opinions.  *See, e.g., Rollins*, 261 F.3d at 856. Although the Commissioner outlines arguably legitimate reasons that the ALJ rejected the treating physicians testimony, this Court is bound "to review the ALJ's decision based on the reasoning and factual findings offered by the ALJ—not *post hoc* rationalizations that attempt to intuit what the adjudicator may have been thinking."  *Bray v. Comm'r of Soc. Security Admin.*, 554 F.3d 1219, 1225 (9th Cir. 2009) (citations omitted).

. . .

1

2

3        **D.      *Remand for Further Proceedings***

4        "'[T]he decision whether to remand the case for additional evidence or simply to

5    award benefits is within the discretion of the court.'"  *Rodriguez v. Bowen,* 876 F.2d 759,

6    763 (9th Cir. 1989) (*quoting Stone v. Heckler,* 761 F.2d 530, 533 (9th Cir. 1985)).

7    "Remand for further administrative proceedings is appropriate if enhancement of the

8    record would be useful."  *Benecke*, 379 F.3d at 593 (*citing Harman v. Apfel,* 211 F.3d

9    1172, 1178 (9th Cir. 2000)).   Conversely, remand for an award of benefits is appropriate

10   where:

11
             (1) the ALJ failed to provide legally sufficient reasons for rejecting the
12           evidence; (2) there are no outstanding issues that must be resolved before a
             determination of disability can be made; and (3) it is clear from the record
13           that the ALJ would be required to find the claimant disabled were such
             evidence credited.
14

15   *Benecke,* 379 F.3d at 593 (citations omitted).  Where the test is met, "we will not remand

16   solely to allow the ALJ to make specific findings. . . . Rather, we take the relevant

17   testimony to be established as true and remand for an award of benefits."  *Id.* (citations

18   omitted); *see also Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1995).  "Even if those

19   requirements are met, though, we retain 'flexibility' in determining the appropriate

20
     remedy."  *Burrell v. Colvin*, 775 F.3d 1133, 1141 (9th Cir. 2014).
21

22

23       Here, the ALJ committed legal error in rejecting treating physicians Drs. Thakur

24   and Patel's opinion evidence.  "Viewing the record as a whole [this Court] conclude[s]

25   that Claimant may be disabled.  But, because the record also contains cause for serious

26   doubt, [the Court] remand[s] . . . to the ALJ for further proceedings on an open record."

27   *Burrell*, 775 F.3d at 1141–42.  The Court expresses no view as to the appropriate result

28

on remand.

## V.    CONCLUSION

In light of the foregoing, the Court REVERSES the ALJ's decision and the case is REMANDED for further proceedings consistent with this decision.

Accordingly, IT IS HEREBY ORDERED that:

1)    Plaintiff's Brief for Plaintiff (Doc. 19) is GRANTED;

2)    The Commissioner's decision is REVERSED and REMANDED;

3)    Upon remand, the Appeals Council will remand the case back to an ALJ on an open record; and

4)    The Clerk of the Court shall enter judgment, and close its file in this matter.

Dated this 26th day of September, 2016.

_____
Honorable Bruce G. Macdonald
United States Magistrate Judge